# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANTONIO HOLT,<br><br>Defendant. | Case No. 20-CR-89-1-JPS<br><br>**ORDER** |

On June 16, 2020, the Government filed a five-count indictment charging Antonio Holt ("Holt") and Emmanuel James ("James") with drug trafficking. (Docket #15). Specifically, Holt was charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), possessing with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), (D), and possessing a gun in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). Holt filed a motion to suppress the physical evidence in this case, followed by an amended motion to suppress, which mooted the first motion to suppress. (Docket #48, #71). On March 12, 2021, Magistrate Judge Stephen C. Dries issued a Report and Recommendation (the "R&R") that denied the motion to suppress. (Docket #80). Holt filed objections to the R&R, which are now fully briefed. For the reasons explained below, the R&R is adopted, and the motion to suppress shall be denied.

1.  **LEGAL STANDARD**

    When reviewing a magistrate judge's recommendation, the Court is obliged to analyze de novo "those portions of the report or specified proposed findings or recommendations to which objection is made." 28

U.S.C. § 636(b)(1)(C). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id*. The Court's review encompasses both the magistrate judge's legal analysis and factual findings. *Id*.; *see also* Fed. R. Crim. P. 59(b).

2.   **FACTUAL BACKGROUND**

Holt objects to Magistrate Judge Dries's characterization of the facts, so the Court will review those facts *de novo*. The Court derives the following facts predominantly from the affidavit of Agent Nathan Peskie ("Peskie"), which he wrote in support of the search warrant for co-defendant James's house, and which the parties have referred to in their briefing. Where appropriate, the Court will also consider the exhibits appended to the parties' briefs.

Holt's story begins on September 22, 2017, when Slinger police arrested the driver of the vehicle involved in a traffic stop. For reasons unknown, the passenger of the vehicle, a man by the name of Kyle Langer, told the police that he and the driver were "on their way to Holt's to purchase an eighth ounce of marijuana and that arrangements had already been made for the drug transaction[.]" (Docket #74-1 ¶ 5). The police did not immediately begin an investigation into Holt, and the lead lay dormant for over a year.

On October 21, 2018, "an anonymous caller reported to Slinger police that at 6:28AM [sic] two high school age females were observed leaving [Holt's apartment] carrying a baggie containing a white powdery

substance." (*Id.* ¶ 6).[1] The caller also complained of a "continuous flow of traffic coming and going from that residence all hours of the day." (*Id.*)

A few months later, on February 14, 2019, Slinger police received another anonymous tip. This caller "stated that sometime in January 2019 a friend brought the caller with him to [Holt's residence] where the friend purchased approximately $300 worth of crack-cocaine." (*Id.* ¶ 7). The caller vaguely described the people who lived at the residence and noted that there was a "large amount of cocaine, crack-cocaine, and ecstasy" in Holt's apartment. (*Id.*)

With three tips in hand, on February 26, 2019, Slinger police conducted "several landfill interdictions" of Holt's house—meaning, they looked through his trash. It is unclear how many times they did this, but the last trash search had concluded by April 30, 2019. During these explorations, they discovered that the utilities were in the name of someone called Elizabeth Brehmer, who was believed to be Holt's girlfriend (there are no facts explaining the basis for this belief). Police also discovered "several plastic baggies and tie offs," though it is unclear how many. (*Id.* ¶ 10) "[S]ome of the baggies tested positive for the presence of cocaine." (*Id.*) Of "several," it is unclear how many "some" might be.

On April 11, 2019, Slinger police received a fourth tip. Damien Gomez reported that he had met a woman in a bar who told him that she could purchase crack-cocaine from Holt's residence. It seemed that she was able to get it at any time of day or night.

---

[1] There was no information furnished regarding how the caller was able to discern the nature and color of the powdery substance at 6:28 a.m., which, in late October, is before sunrise.

A month later, on May 7, 2019, Slinger police received a fifth tip, this one also anonymous. This caller complained that his ex-girlfriend and an old friend were "running heroin and crack-cocaine for a black male known as 'Tone.'" (*Id.*) This caller reported that "Tone" was in his thirties and may live behind the Burger King in Slinger.

On July 3, 2019, a confidential informant, CI 19-38, provided the first break in the case. She explained that she frequently purchased crack-cocaine from a man named "Tony." She had known him for about three years and had purchased crack-cocaine from him at least fifty times. She said that he typically sold one gram of crack-cocaine for approximately $100, and that she usually purchased the drugs through a friend. Her last purchase had been in early June. She relayed that she used to purchase the crack-cocaine at Tony's residence, but, following an arrest, "Tony" became more cautious and began conducting his trades in various parking lots. CI 19-38 identified "Tony's" residence as Holt's residence on Google Maps, and identified Holt as "Tony" using a booking photo. Following this discussion, Slinger police obtained an administrative subpoena for Holt's phone number, which seemed to corroborate that CI 19-38's friend, through whom she purchased crack-cocaine, had been in somewhat regular contact with Holt.

On July 10, 2019, Slinger police received authorization to use a pen registry device on Holt's phone, as well as to monitor its GPS. The pen registry recorded incoming and outgoing contacts associated with Holt's phone number.

On August 18, 2019, Slinger police met with another confidential information, dubbed CI-3074. This informant said she had met "Tone" about three months ago and had purchased crack-cocaine from him three

or four times, each time at a cost of $100 per gram. CI-3074 said she usually purchased the drugs in a parking lot. The informant provided the police with Holt's phone number and identified him through his booking photo. The next day, CI-3074 initiated a controlled buy with Holt via text. Police observed as Holt drove to the informant's apartment complex, stayed for a short while, and then left. Police did not observe the purported drug transaction because it occurred in CI-3074's apartment. However, there was audio and video of the transaction. (Docket #83-1 at 5). Before the transaction, CI-3074 had $200; afterward, she had "a small 'rock' of crack-cocaine." (*Id.*)

In September, police received their eighth source of information regarding Holt. On September 24, 2019, informant DTF 19-46, told police that he, too, had frequently purchased crack-cocaine from Holt. DTF 19-46 gave police Holt's phone number, which corresponded to the one they already had on file. DTF 19-46 also identified Holt via his booking photo. DTF 19-46 explained that he had last purchased crack-cocaine from Holt two months earlier. He explained that these purchases often occurred at an intersection in Hartford. DTF 19-46 attempted to initiate a controlled buy from Holt, but Holt texted DTF 19-46 to contact "his guy 'Lex,'" and provided another phone number. This was sufficient for officers to identify Alexander Nuoffer ("Nuoffer") as "Lex." (Docket #74-1 ¶ 18).

On September 24 and 27, officers conducted two controlled buys from Lex. During the first one, Nuoffer "made comments about Holt and his operation and how they sell grams to make 'their' money." (*Id.*) The transactions resulted in a purchase of 2.02 grams of cocaine base in exchange for $275, and 3.93 grams of cocaine base in exchange for $250.

On September 30, Slinger police got in touch again with CI-3074 and asked her to contact Holt to set up another controlled buy. This time, Holt referred her to Nuoffer, who facilitated another purchase of $200 worth of cocaine base. Following this transaction, officers obtained a GPS tracking order for Nuoffer's car. They noticed "frequent trips made by Nuoffer to numerous known customers of Holt's," as well as "multiple" trips to Holt's apartment. (*Id.* ¶ 22). Later, records from Nuoffer's cell phone in November demonstrated frequent communication between Holt and Nuoffer. (*Id.* ¶ 24).

On October 24, police conducted another controlled buy with Nuoffer, who mentioned, during the transaction, that his supplier was still Holt—Nuoffer said that "'Tony' had a new source of supply but 'Tony' still cooks the powder into crack[-]cocaine." (*Id.* ¶ 22). Nuoffer expressed hope that Holt would teach him how to cook crack-cocaine, as well.

Slinger police officers purchased crack-cocaine from Nuoffer five more times between November 2019 and March 2020. During that time, they also observed Nuoffer make frequent, brief trips to Holt's apartment. (*Id.* ¶¶ 36, 41).

Starting in November 2019, perhaps considering Holt's recent decision to delegate hand-to-hand drug transactions to Nuoffer, the officers began to focus on Holt's activities in Milwaukee, hoping to identify Holt's cocaine supplier. They used "data collected from the GPS tracker installed on Holt's Hyundai Sonata" to determine his whereabouts and contacts. (*Id.* ¶ 26). Police "noted that Holt frequented two areas on the north side of Milwaukee when he made trips to Milwaukee." (*Id.* ¶ 26). The areas are not defined. There were "two (2) numbers of interest that were consistently contacted on dates when Holt traveled to Milwaukee." (*Id.*) The officers

obtained administrative subpoenas for these numbers, including one that ended in 8687 ("the 8687-number"). The affidavit does not discuss the results of the subpoenas.

On November 25, 2019, "Holt travel[ed] to the area of N[.] 36 Street and W[.] Toronto Street consistent with previous trips." (*Id.* ¶ 29). The affidavit does not state when these previous trips occurred, but the Court infers that this intersection is one of the "frequented two areas on the north side of Milwaukee." (*Id.* ¶ 26). On December 11, 2019, "Peskie conducted physical surveillance of the area of N[.] 36 Street and W[.] Toronto Street in the City of Milwaukee" upon noticing, via GPS, that Holt was traveling towards Milwaukee. (*Id*. ¶ 30). At around 2:05 on December 11, Peskie saw Holt turn onto West Toronto Street and park his Hyundai Sonata. At 2:06 p.m.,

> a black Chevrolet Suburban pulled up and parked directly behind Holt's vehicle. The SUV was driven by a black male, your affiant was able to reposition and observed both the driver and a Wisconsin registration of AEB8926.

(*Id.* ¶ 30(B)). There is no other description of the driver. Holt got out of his car and into the front passenger's seat of the Chevrolet Suburban. He stayed there until 2:13 p.m., at which point both cars left the scene, and Holt drove back to Slinger. Based on his experience as a police officer, Peskie determined that this meeting was a "drug transaction." (*Id.* ¶ 30(D)).

After observing this "short meeting," Peskie obtained "a chronological report of Holt's cell phone activity from 1:30PM-2:15PM [sic]." (*Id.* ¶ 30(D)). This report demonstrated that "Holt only made one (1) outgoing text message and one (1) outgoing voice call in the specified time period . . . to [the 8687-number], and there was one (1) incoming text also from that number." (*Id.*) The affidavit does not contain precise time

Page 7 of 14
Case 2:20-cr-00089-JPS   Filed 08/31/21   Page 7 of 14   Document 93

stamps, but the Court infers that the 8687-number may have been associated with the man in the Chevrolet Suburban.

On May 11, 2020, Holt left Slinger in his Hyundai Sonata and drove down "to the area of . . . XXXX N 36th Street in the City of Milwaukee, Milwaukee County Wisconsin and was only at the address for approximately thirteen (13) minutes." (*Id.* ¶ 45). After this brief stop, Holt's car travelled to the City of Rockford, Illinois, where it parked in an alley for about one hour and thirty-eight minutes. Next, the car stopped briefly at Burger King and Subway, and then again at a gas station, before leaving Rockford and going back to Wisconsin. (*Id.* ¶ 45). Peskie coordinated a stop of Holt's car on I-43 in Milwaukee County. A drug detection dog alerted on the vehicle, but the officers only found two handguns and "a large sum of U.S. Currency banded in rubber bands in a plastic shopping bag" in the car. (*Id.* ¶ 46).

3. **ANALYSIS**

Magistrate Judge Dries determined that there was probable cause for Holt's arrest based on the lengthy investigation and, relatedly, that the search of the car was a search incident to a lawful arrest. (Docket #80).[2] Holt's primary objections to the R&R are that there was no probable cause

---

[2] Magistrate Judge Dries also properly determined that there was a material factual dispute regarding (1) whether State Trooper Medina, the arresting officer, could have seen marijuana on the floor of Holt's car, and (2) whether the dog properly alerted on the car. Each of these facts, if established, may have established probable cause for a search. However, Magistrate Judge Dries determined that these issues were not relevant to his conclusion, as the car search was a reasonable search incident to a lawful arrest. Because this Court reaches the same conclusion, it adopts Magistrate Judge Dries's holding that an evidentiary hearing is not necessary. Because of this, the fact that the CD containing dashboard camera footage, which was furnished to the Court, appears to be blank is ultimately of no moment.

Page 8 of 14
Case 2:20-cr-00089-JPS   Filed 08/31/21   Page 8 of 14   Document 93

for the arrest or the subsequent search of the car. (Docket #83). The Court acknowledges that Magistrate Judge Dries's conclusions rested, in part, on the flawed determination that the police had probable cause to believe that James, the passenger in the car, was involved in the drug trade as well, and that his residence, where Holt stopped earlier that day, was the source of the cocaine. Accordingly, when this Court evaluates whether there was probable cause to arrest Holt and search his car, it focuses only on the facts recited in Section 2, above.

### 3.1 Probable Cause

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It requires searches to be conducted pursuant to a warrant, issued upon probable cause that a crime occurred. *Id.* The "central teaching" of the Supreme Court's "decisions bearing on the probable cause standard is that it is a 'practical, nontechnical conception.'" *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 170, 176 (1949)). These "probabilities" are non-technical; "they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (quoting *Brinegar*, 338 U.S. at 175).

"It is a rare case where 'staleness' will be relevant to the legality of a warrantless arrest." *United States v. Haldorson*, 941 F.3d 284, 292 (7th Cir. 2019). In *Haldorson*, the Seventh Circuit noted that delays of up to one month would not render evidence in support of probable case stale and declined resolve, definitively, "when probable cause to arrest may become stale." *Id.* at 291, 293. The Seventh Circuit acknowledged there "could be circumstances in which the subsequent investigation turns up new facts or

Page 9 of 14
Case 2:20-cr-00089-JPS   Filed 08/31/21   Page 9 of 14   Document 93

evidence that disprove or discredit the original information," but explained that those were not the facts in that case. *Id.* at 292.

Holt argues that the evidence against him was stale by May 2020 and, relatedly, that the length of the investigation diluted the substance of the information found. Specifically, Holt argues that he had not been seen with crack-cocaine since August 2019.[3] He contends that the other facts in the affidavits—such as the various anonymous tips and the meager trash pulls—when stretched over a period of two years, do not amount to probable cause.

That may be true, but these are not the only facts in the affidavit. In the nine months following the successful controlled buy in August 2019, the affidavit explains how Holt's connection to the drug trade continued. First, Holt referred new buyers to "his guy" Nuoffer, who sold crack-cocaine to undercover investigators well into March 2020 (when, presumably, investigative activity slowed due to the pandemic). Nuoffer, in turn, identified Holt as the person from whom he sourced the cocaine, and explained that Holt cooked the powder into crack-cocaine. (Docket #74-1 ¶ 22). During the period that police officers conducted these controlled buys, Nuoffer continued to make frequent, short stops to Holt's home. (*Id.* ¶ 41)

---

[3]In his reply brief and in his objections, Holt argues that the controlled buy was not properly conducted because it occurred in the informant's apartment, which had not been searched for crack-cocaine ahead of time. This Court has held that arguments not raised in the first instance are deemed waived; therefore, it will not consider the issue. However, even if this issue were properly raised, it seems that this argument would not have won the day for Holt because the controlled buy was caught on audio-visual technology. *See United States v. Glenn*, 966 F.3d 659, 661 (7th Cir. 2020) (explaining that an audio and visual record of a controlled buy will furnish probable cause in a situation where it was not clear whether the informant had been searched before the transaction); (Docket #83-1 at 5) (describing the audio-visual component of the controlled buy in this case).

(explaining that, as of February 2020, Nuoffer's car "continues to make frequent stops at Holt's residence"). Thus, Holt's argument regarding staleness is not so compelling when additional information revealed through the investigation continued to tie Holt to a drug-trafficking endeavor.

On balance, there was probable cause to arrest Holt for drug trafficking given the totality of circumstances: (1) eight tips identified Holt as a drug trafficker over a two-year period; (2) trash pulls showed the presence of crack-cocaine in his apartment on a few occasions in early 2019; (3) a controlled buy in August 2019 indicated that Holt sold crack-cocaine; (4) in the latter half of 2019, Holt referred an investigating officer seeking to purchase crack-cocaine to "his guy" Nuoffer; (5) Nuoffer confirmed, in late October 2019, that his supply was from Holt, who cooked the drug; (6) in December 2019, Peskie saw a meeting in Milwaukee between Holt and another individual, which Peskie had reason to suspect was drug-related; (7) Nuoffer participated in four additional controlled buys and, at least through February 2020, continued to make frequent, brief stops at Holt's house; and (8) Holt had been making trips to Milwaukee during the pandemic lockdown, during which he would make short visits to two specific areas that correlated with two specific phone numbers (at least one of which was believed to be involved in the drug trade), then drive directly back to Slinger.

In other words, this is not a case where Holt's last drug-related activity occurred nine months before the arrest, and subsequently the case went dead. Nor is this a case where, after being referred to Nuoffer, investigators learned that Holt was out of the drug-selling game. *See Glenn*, 966 F.3d at 661 (explaining that "the passage of time does not necessarily

Page 11 of 14
Case 2:20-cr-00089-JPS   Filed 08/31/21   Page 11 of 14   Document 93

imply that a retail site for drug sales has ceased to be so," particularly when there was no "reason to think that [the defendant] had changed his line of business"). To the contrary, investigators continued to learn about Holt's regular connections to Nuoffer's active, hand-to-hand drug dealing. This, in turn, sustained the probable cause to believe that he, too, was involved with the drug trade.

Having concluded there was adequate probable cause to arrest Holt, and given that neither party disputes that an arresting officer need not *personally* have knowledge supporting probable cause in order to legally effectuate an arrest, *see United States v. Harris*, 585 F.3d 394, 399 (7th Cir. 2009), the Court now turns to whether the search incident to the arrest was valid. A search of a vehicle incident to a lawful arrest may not be conducted without a warrant unless "an arrestee is within reaching distance of the passenger compartment at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the offense of the arrest." *Arizona v. Gant*, 556 U.S. 332, 346 (2009) (emphasis added). The Seventh Circuit has observed that "[t]he suspicion required for a vehicle search incident to arrest under *Gant* is keyed to the offense of arrest" while the automobile exception to the warrant requirement, which requires probable cause to believe that evidence of a crime might be found in the car, "is not tied to an arrest." *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 1014). Rather, "a search of a vehicle incident to an arrest is permitted when 'it is *reasonable to believe* the vehicle contains evidence of the offense of arrest.'" *United States v. Paige*, 870 F.3d 693, 702 (7th Cir. 2017) (quoting *Gant*, 556 U.S. at 346).

Here, Holt was arrested for drug trafficking. The Court must, therefore, consider whether it was "reasonable to believe the vehicle contains evidence of [drug trafficking.]" *Gant*, 556 U.S. at 346. The mere fact

that a person is arrested in a vehicle does not automatically provide reason to believe that evidence of a crime will be found in the vehicle. *See id.* at 345 ("A rule that gives police the power to conduct such a search whenever an individual is caught committing a traffic offense, when there is no basis for believing evidence of the offense might be found in the vehicle, creates a serious and recurring threat to the privacy of countless individuals."). Rather, the Court must "look[] beyond the nature of the offense and emphasize[] facts particular to the case." *United States v. Taylor*, 49 A.3d 818, 826 (D.C. 2012).

Holt advances that there was insufficient evidence to reasonably suspect that the red Hyundai was used to transport drugs. He urges that an evidentiary hearing is needed. However, there are no material disputes that would warrant a hearing. The Court finds, based on the undisputed facts presented, that it was reasonable for the police to believe that there would be evidence of drug trafficking in the red Hyundai Sonata.

During the time that investigators conducted repeated controlled buys from Nuoffer (who, in turn, was making regular stops at Holt's residence), Holt was making brief trips to Milwaukee in his red Hyundai Sonata—trips that continued well into the pandemic lockdown. *See, e.g.*, (*id.* ¶ 26) (discussing the GPS tracker installed on Holt's Hyundai Sonata); (*id.* ¶ 30) (describing the meeting between Holt, in his Hyundai Sonata, and the man in the black Chevrolet Suburban); (*id.* ¶¶ 44, 45) (describing the activities of the Hyundai Sonata in May 2020). Based on these observations, as well as information received from Nuoffer, the police had reason to believe that Holt sourced cocaine during his brief trips to Milwaukee—it goes without saying that Slinger is neither an intersection of commerce nor a place known for cocaine growth. Given that Holt consistently drove his

red Hyundai Sonata on these trips, the police also had reason to believe that evidence of a drug trade might be found in that car. Accordingly, the search of the car was valid under *Gant*.

4.  **CONCLUSION**

The Court will adopt the R&R for the reasons explained above and will deny the motion to suppress.

Accordingly,

**IT IS ORDERED** that Defendant Antonio Holt's objections to Magistrate Judge Stephen C. Dries's Report and Recommendation (Docket #83) be and the same are hereby **OVERRULED**;

**IT IS FURTHER ORDERED** that Magistrate Judge Stephen C. Dries's Report and Recommendation (Docket #80) be and the same is hereby **ADOPTED** as stated in the terms of this Order;

**IT IS FURTHER ORDERED** that Defendant Antonio Holt's amended motion to suppress (Docket #71) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that Defendant Antonio Holt's first motion to suppress (Docket #48) be and the same is hereby **DENIED as moot**.

Dated at Milwaukee, Wisconsin, this 31st day of August, 2021.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge